UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

TAB CHAPMAN, on behalf of himself
and all others similarly situated,

      Plaintiff,

v.                                 Civil No. 2:20cv106

SABER HEALTHCARE GROUP, LLC,
AUTUMN CORPORATION, and
AUTUMN CARE OF PORTSMOUTH, L.P.,

      Defendants.

## OPINION AND ORDER

The Fair Labor Standards Act ("FLSA") gives "similarly situated" employees the ability to band together and sue their employer for unpaid minimum wages and overtime compensation. 29 U.S.C. § 216(b). To determine whether employees are similarly situated, these suits—known as "collective actions"—proceed in two steps: first, a conditional certification stage to decide whether potential plaintiffs should be notified of the suit, and second, a fact-intensive stage to determine whether the plaintiffs seeking to join the suit are in fact similarly situated. This matter is before the Court at step one: the conditional certification stage. Plaintiff Tab Chapman ("Plaintiff") has filed a motion seeking (1) conditional certification of his collective action, and (2) court-authorized notice of his suit to potential opt-in plaintiffs. ECF No. 100. Defendants Saber Healthcare Group, LLC

("Saber") and Autumn Corporation ("Autumn") (collectively, "Defendants") have filed a response in opposition, ECF No. 102, and Plaintiff has filed a reply, ECF No. 103. On August 15, 2022, the Court held a hearing on the matter. For the reasons stated below, the Court **GRANTS in part and DENIES in part** Plaintiff's motion.

## I. BACKGROUND

Autumn is a North Carolina corporation that owns nineteen nursing facilities in Virginia and North Carolina. ECF No. 101-13, at 27. Autumn's facilities are affiliated with Saber, an Ohio corporation, but the nature of their relationship is not entirely clear at this stage of the case. To the public, Saber boasts that it manages over 100 facilities located in Ohio, Indiana, Pennsylvania, Florida, Virginia, North Carolina, and Delaware. ECF No. 101-8, at 2. To the Court, however, Saber insists that it "does not own or operate any nursing homes," but instead provides "consulting services" to its affiliates, including legal support, payroll processing, human resources assistance, and guidance on best practices regarding patient care. ECF No. 102, at 5–6; ECF No. 101-29, at 132–34.

Plaintiff Tab Chapman worked as a certified nursing assistant ("CNA") at Autumn's Portsmouth, Virginia facility from 2018 to 2019. ECF No. 101-3 ¶ 2. In 2021, Plaintiff worked as a CNA at two non-Autumn, Saber-affiliated facilities in Virginia: Portside

2

and Waterside. Id. According to Plaintiff, Saber implemented two "policies" at these and other affiliated facilities that deprived him and other hourly "patient care workers" of full compensation for all hours worked, in violation of the FLSA. ECF No. 101, at 8-9.

First, Plaintiff claims that patient care workers were subject to a meal break policy that automatically deducted 30 minutes from their compensated time, regardless of whether they actually took a 30-minute uninterrupted meal break. ECF No. 101-3 ¶¶ 8-9. Plaintiff alleges that meal breaks were often missed—and consequently, 30 minutes was often erroneously deducted—because patients could not be abandoned, and chronic understaffing made it difficult to find coverage. Id. ¶¶ 9, 12. While a patient care worker could correct an erroneous meal break deduction by submitting a time adjustment form signed by his supervisors, Plaintiff contends that his supervisors discouraged him from submitting the form. Id. ¶ 11. As a result, Plaintiff regularly worked during unpaid meal breaks without compensation.

Second, Plaintiff claims that patient care workers were deprived of full compensation for off-the-clock work. According to Plaintiff, patient care workers were required to punch in within seven minutes of their shift beginning and punch out within seven minutes of their shift ending (because the punch clock rounded to the nearest quarter hour), but they were often required to work

3

before they were permitted to clock in and after they were permitted to clock out.  Id. ¶¶ 16–17.

In light of these alleged FLSA violations, Plaintiff brought a collective action against Defendants pursuant to 29 U.S.C. § 216(b).  Contending that Saber and Autumn are "joint employers" under the FLSA, Plaintiff's motion requests conditional certification of the following collective:

> All current and former hourly, non-exempt [patient care workers] of Saber Healthcare ("Saber") and/or Autumn Corp. ("Autumn") nationwide at any time in the last three years until resolution of this action.

ECF No. 100, at 1.[1]  Plaintiff's motion is supported by evidence gleaned from pre-conditional-certification discovery, including a litany of documents and four deposition transcripts.  ECF Nos. 101-7 to 101-31.  Plaintiff's motion is also supported by declarations from himself and three prospective opt-in plaintiffs: Brenika Bailey, Maquida Smith, and Leah Johnson.  Bailey was a former CNA at Autumn's Portsmouth and Suffolk facilities.  ECF No. 101-4 ¶ 2.  Smith was a former CNA at Autumn's Chesapeake and Portsmouth facilities.  ECF No. 101-5 ¶ 2.  And Johnson was a

---

[1] Plaintiff's motion requests conditional certification of a collective composed of all non-exempt "employees"—not any specific subset, such as "patient care workers."  See ECF No. 100, at 1.  However, Plaintiff's reply brief requests a narrower collective composed of "hourly, non-exempt patient care employees."  ECF No. 103, at 10 (emphasis added).  When asked about this inconsistency at the hearing, Plaintiff informed the Court that he intended to limit the collective to "patient care workers" who had direct patient care responsibilities.  The Court will therefore evaluate Plaintiff's requested collective with the added patient care limitation.

former CNA at the Saber-affiliated Portside facility. ECF No. 101-6 ¶ 2. Relying on mostly boilerplate language, all four declarants maintain that:

- They were full-time CNAs who worked at Saber-affiliated facilities in Virginia.

- Their job duties involved patient care, patient monitoring, assisting medical personnel, completing charts, and communicating with patients and their families.

- They regularly worked more than 40 hours per week.

- Their meal breaks were often interrupted or missed entirely due to the nature of their work and chronic understaffing, but 30 minutes was still deducted for meal breaks.

- The erroneous deduction was often not rectified.

- They could not clock in more than seven minutes before their shift began or clock out more than seven minutes after their shift ended.

- They were expected to perform work off-the-clock.

- Their managers knew that they were performing work during meal breaks and off-the-clock.

See ECF Nos. 101-3, 101-4, 101-5, 101-6.

Autumn and Saber advance several arguments in opposition to conditional certification of Plaintiff's collective action. See ECF No. 102. They have also appended eight declarations from Autumn patient care workers contradicting the claims made by the Plaintiff and his fellow opt-ins. See ECF Nos. 102-4 to 102-11.

## II. LEGAL STANDARD

FLSA "collective actions" are intended to resolve common issues of law and fact in one proceeding and lower the individual

5

costs of vindicating rights. See Hoffman-La Roche Inc. v. Sperling, 493 U.S. 165, 170 (1989). To be part of a collective action, an employee must "opt in" by providing written consent to the court indicating that he intends to join the suit. Degidio v. Crazy Horse Saloon & Rest. Inc., 880 F.3d 135, 143 (4th Cir. 2018).

To proceed as a collective, plaintiffs must demonstrate that they are "similarly situated." 29 U.S.C. § 216(b); Houston v. URS Corp., 591 F. Supp. 2d 827, 831 (E.D. Va. 2008). The FLSA does not define "similarly situated," and the Fourth Circuit has yet to adopt a precise definition of the term. Edwards v. Optima Health Plan, No. 2:20cv192, 2021 WL 1174724, at *4 (E.D. Va. Mar. 29, 2021). In the absence of controlling precedent, district courts have consistently employed a two-step process to determine whether potential plaintiffs are similarly situated. McNeil v. Faneuil, Inc. (McNeil I), No. 4:15cv81, 2016 WL 11673836, at *3 (E.D. Va. Mar. 2, 2016).

The first step is the conditional certification stage, which typically occurs early in the discovery process. At this stage, the court must decide whether to facilitate the opt-in process by conditionally certifying the collective and authorizing notice of the suit to potential plaintiffs. Houston, 591 F. Supp. 2d at 831. Because there is ordinarily limited discovery at this stage, "plaintiffs seeking conditional certification need only make a modest factual showing sufficient to demonstrate that they and

6

potential plaintiffs together were victims of a common policy or plan that violated the law." Choimbol v. Fairfield Resorts, Inc., 475 F. Supp. 2d 557, 564 (E.D. Va. 2006). When deciding whether a plaintiff has satisfied this threshold requirement, the court does not resolve factual disputes, decide substantive issues, or evaluate credibility. See Gregory v. Belfor USA Grp., Inc., No. 2:12cv11, 2012 WL 3062696, at *5 (E.D. Va. July 26, 2012).

While the standard at step one is "fairly lenient," it is not a formality. Houston, 591 F. Supp. 2d at 831. Indeed, a plaintiff must show that "the presence of common issues allows the class-wide claims to be addressed without becoming bogged down by individual differences among class members." Id. at 832. If a plaintiff makes such a showing, the court can facilitate the opt-in process "by allowing discovery of the names and addresses of potential plaintiffs or by some other appropriate action." Id. However, if a plaintiff does not make such a showing, the court can "deny certification" without the need to proceed to the second stage. Purdham v. Fairfax Cnty. Pub. Schs., 629 F. Supp. 2d 544, 547 (E.D. Va. 2009).

If the court conditionally certifies the collective, the suit proceeds to the second step: the decertification stage. The decertification stage occurs after discovery is "virtually complete," and begins when a defendant files a motion to decertify the collective. Choimbol, 475 F. Supp. 2d at 563. At this stage,

the court applies a "heightened fact specific standard" to determine whether plaintiffs are in fact similarly situated. Id. "Courts have identified a number of factors to consider at this stage, including (1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants that appear to be individual to each plaintiff; and (3) fairness and procedural considerations." Curtis v. Time Warner Ent.-Advance/Newhouse P'ship, No. 3:12cv2370, 2013 WL 1874848, at *3 (D.S.C. May 3, 2013) (quoting Morgan v. Fam. Dollar Stores, Inc., 551 F.3d 1233, 1261 (11th Cir. 2008)) (cleaned up). If collective plaintiffs are in fact similarly situated, the collective is certified. Choimbol, 475 F. Supp. 2d at 563. If they are not, the collective is decertified, and the plaintiffs may proceed on their claims individually. Id.

## III. CONDITIONAL CERTIFICATION

### A. Defendants' Request for a Heightened Certification Standard

At the outset, Defendants challenge the applicability of the "lenient" conditional certification standard discussed above, arguing that it applies only when "the parties have not had an opportunity to conduct discovery before the filing of a motion for conditional certification." ECF No. 102, at 8. Because the parties in this case have conducted multiple depositions and exchanged numerous documents, Defendants contend that this Court should apply a more stringent "intermediate" standard, which they

8

allege "many courts" apply when "some but not all discovery has already been completed." Id. (emphasis added). Plaintiff, of course, disputes Defendants' assertion. ECF No. 103, at 1–4.

While some district courts in the Fourth Circuit have applied an intermediate standard at the conditional certification stage, "the majority of courts within the Fourth Circuit" have declined to do so, even when some discovery has already been conducted. McNeil v. Faneuil, Inc. (McNeil II), No. 4:15cv81, 2016 WL 11673838, at *4 (E.D. Va. Aug. 3, 2016) (collecting cases). Indeed, judges from this District in particular have consistently applied the lenient standard, even in cases where depositions were taken. See, e.g., Houston, 591 F. Supp. 2d at 830–31 (applying the lenient standard at step one even after the parties conducted pre-certification discovery, including depositions of the parties' representatives); McNeil II, 2016 WL 11673838, at *4 ("As in Houston, the fact that this Court permitted some initial discovery pertaining to the conditional certification issue should not change the Court's standards.").

There are several reasons animating district courts' general reluctance to apply a heightened standard at step one. For one thing, it is premature to conclude that the evidence gleaned from limited discovery is representative of what the plaintiffs would present after full discovery. McNeil II, 2016 WL 11673838, at *4. For another, it is unclear where on the spectrum the intermediate

9

standard lies between the lenient standard that is otherwise applicable at step one and the heightened, fact-specific standard applicable at step two.  As a judge in the District of Maryland thoughtfully put it:

> Intermediate connotes in the middle; therefore, the standard seems ideally suited for situations in which the parties have conducted approximately half of the discovery.  But what about cases where—as may be the case here—the parties have conducted only a third, a quarter, or even a fifth discovery?  Are courts still to apply the intermediate standard?  [Defendant] might call for a sliding scale in which the Court would calibrate the standard to the quantum—and perhaps quality—of conducted discovery.  Assuming this approach is analytically sound, the Court would nonetheless display disinclination to inject this much flexibility—and, by extension, uncertainty—into the remedial scheme that § 216(b) contemplates.

Essame v. SSC Laurel Operating Co., 847 F. Supp. 2d 821, 827 (D. Md. 2012).

Given the case law in this District, and the practical reasons supporting the lenient standard, the Court rejects Defendants' request to apply an "intermediate standard" at this stage of the proceedings.  The Court will instead apply the lenient standard.

## B. Similarly Situated

The brunt of the parties' dispute centers on whether Plaintiff has met his burden to demonstrate that potential plaintiffs are similarly situated.  As discussed above, plaintiffs are similarly situated when they "together were victims of a common policy or plan that violated the law."  Choimbol, 475 F. Supp. 2d at 564.

10

Plaintiff contends that Defendants implemented "timekeeping and payroll policies" that "deprived" Plaintiff and putative collective members of "pay for all hours worked, including the hours they worked during their meal breaks and/or off-the-clock." ECF No. 101, at 8. Despite Plaintiff's attempt to fuse these two policies into one, in reality, there are two alleged "policies" at issue here: (1) Defendants' practices with respect to off-the-clock work, and (2) Defendants' practices with respect to meal breaks.[2] See, e.g., Meeker v. Med. Transport, LLC, No. 2:14cv426, 2015 WL 1518919, at *3 (E.D. Va. Apr. 1, 2015) (treating a "meal deduction claim" as separate from an "off-the-clock claim").

As a general matter, "when alleged FLSA violations stem from the enforcement decisions of individual supervisors, without a company-wide policy or plan directing those enforcement decisions, collective treatment is not appropriate." MacGregor v. Farmers Ins. Exch., No. 2:10cv3088, 2011 WL 2981466, at *3 (D.S.C. July 22, 2011) (quoting Adair v. Wis. Bell, Inc., No. 1:08cv280, 2008 WL 4224360, at *7 (E.D. Wis. Sept. 11, 2008)) (cleaned up).

---

[2] At the hearing, Plaintiff argued that these policies constitute one policy because they both require employees to work off the clock without compensation. But this argument is too general. The meal break deduction policy concerns Defendants' automatic 30-minute deduction for meal breaks, Defendants' expectations for patient care workers during their meal breaks, and Defendants' practices with respect to rectifying erroneous meal-break deductions. In contrast, the off-the-clock policy concerns Defendants' policies for clocking in and out at the beginning and end of the workday and how the punch clock rounds time. In the Court's view, these are distinct policies.

Latching onto this, Defendants argue that conditional certification is inappropriate here because neither Saber nor Autumn has a written policy that requires either off-the-clock work or work during meal breaks. See ECF No. 102, at 14-16, 18-19. Rather, Defendants assert, there are written policies against such practices. See id.

While Defendants are correct that there is no evidence of a written policy adopting the alleged practices, see ECF No. 101-20, at 16; ECF No. 101-23, at 14; ECF No. 102-1, an "unwritten policy" can satisfy the similarly situated requirement if the "numerosity and geographic diversity" of the presented declarations demonstrate that violations were consistent across different facilities and supervisors, MacGregor, 2011 WL 2981466, at *4. Thus, the question at this stage is whether Plaintiff has presented sufficient evidence to show that there were unwritten policies, consistently applied, that required putative collective members to work before or after shifts or during unpaid meal breaks without compensation. To answer that question, the Court will start with the off-the-clock policy, then evaluate the meal break policy, and then address Defendants' miscellaneous objections.

### 1. Off-the-Clock Work

As noted above, Plaintiff maintains that Defendants require putative collective members to work before clocking in and after clocking out, depriving them of wages for work performed off the

12

clock.  ECF No. 101, at 12.  This off-the-clock work consists of obtaining shift assignments, performing shift changes, preparing for the day, attending meetings, finishing paperwork, tending to patients or emergency situations, and cleaning.  Id.  In response, Defendants contend that there is no uniform, unwritten practice with respect to off-the-clock work, but rather decentralized and independent action by supervisors at individual facilities.  ECF No. 102, at 22.  After reviewing the evidence before it, the Court agrees with Defendants.

Plaintiff's supporting declarations—submitted by four CNAs who worked exclusively in the Hampton Roads region—are neither numerous nor geographically diverse.  See MacGregor, 2011 WL 2981466, at *4.  And Plaintiff's experiences, as outlined in his declaration and his deposition, differ from the three opt-in plaintiffs.  For instance, whereas all three opt-in plaintiffs assert that pay was docked and timeslips were changed if an employee clocked in too early or too late, Plaintiff makes no such allegation.  See ECF No. 101-3 ¶ 16; ECF No. 101-4 ¶ 13; ECF No. 101-5 ¶ 12; ECF No. 101-6 ¶ 12.  Further, whereas all three opt-in plaintiffs claim that they had to work after clocking out on a regular basis,[3] Plaintiff claims that he had to work after clocking out on only two or three occasions during the entire time he worked

---

[3] Smith also adds that she had to work on days she was "scheduled to be off."  ECF No. 101-5 ¶ 14.

at Defendants' facilities. See ECF No. 101-3 ¶ 17; ECF No. 101-4 ¶ 15; ECF No. 101-5 ¶ 14; ECF No. 101-6 ¶ 13. At bottom, such a small number of geographically homogenous declarations, in combination with the material inconsistencies between them, demonstrates that the alleged off-the-clock violations were "the product of happenstance or outlier instances of rogue supervisor behavior." McNeil I, 2016 WL 11673836, at *3. Thus, conditional certification on a work-off-the-clock theory is inappropriate.

## 2. Meal Break Policy

Turning to Defendants' alleged automatic meal break deduction policy, it is well established that an automatic deduction for a meal break is not a per se violation of the FLSA. See DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc., 27 F. Supp. 3d 313, 320–21 (E.D.N.Y. 2014); Marshall v. Novant Health, Inc., No. 3:18cv633, 2020 WL 5577888, at *7 (W.D.N.C. Sept. 17, 2020). As a result, a plaintiff seeking conditional certification must show that an automatic meal break deduction works in concert with some other policy or practice to deprive employees of pay for work performed during unpaid meal breaks. For example, an employer's expectation that employees remain on call during their meal breaks, in combination with an automatic meal break deduction policy, has been found to be sufficient to support conditional certification. See Lobo v. Sprint Safety, Inc., No. 4:19cv3934, 2020 WL 3618678, at *5 (S.D. Tex. July 2, 2020). So too has an employer's practice

14

of routinely ignoring or discouraging the use of time adjustment forms to correct an erroneous deduction.  See Lindberg v. UHS of Lakeside, LLC, 761 F. Supp. 2d 752, 761 (W.D. Tenn. 2011) (finding conditional certification appropriate where an employer (1) "utilized an auto-deduction policy that placed the burden of correction on hourly employees"; (2) was "aware of, permitted, and/or demanded that employees continue to work during unpaid meal periods"; and (3) "routinely ignored or discouraged the use of time adjustment forms to reverse the automatic deduction").

Plaintiff, for his part, alleges that Defendants did both of these things.  See ECF No. 101, at 9, 11.  In support of the "on call" claim, all four declarants contend that they often could not take a full meal break because they were prohibited from leaving patients without coverage and chronic understaffing made it difficult to find coverage.[4]  See ECF No. 101-3 ¶ 9; ECF No. 101-4 ¶ 8; ECF No. 101-5 ¶ 7; ECF No. 101-6 ¶ 8.  In addition, all four declarants allege that they were often summoned, in some form or another, to treat patients during their meal breaks, effectively depriving them of a bona fide meal period.  See id.

---

[4] The declarations employ largely boilerplate language on this point. However, "while some courts have questioned the credibility of identical employee declarations, other courts have held that the credibility of plaintiffs' declarations should not be addressed at this early stage of conditional class certification." McNeil I, 2016 WL 11673836, at *4 (citations omitted) (rejecting the defendant's argument that boilerplate language should be treated with skepticism at the conditional certification stage).  Because this case is at step one, the Court will not use the boilerplate language in the declarations against Plaintiff.

As for the "discouragement" claim, (1) Defendants clearly placed the onus of correcting erroneous deductions on putative collective members; (2) all four declarants allege that management knew that patient care workers were working through unpaid meal breaks; and (3) all four declarants allege that they were unable to correct erroneous deductions due to actions by their supervisors. See ECF No. 101-3 ¶¶ 10-14; ECF No. 101-4 ¶¶ 9-11; ECF No. 101-5 ¶¶ 8-10; ECF No. 101-6 ¶¶ 8-10; see also Lindberg, 761 F. Supp. 2d at 760-61. The declarants also provide specific allegations illustrating how they were discouraged from submitting time adjustment forms. Plaintiff contends that his facility administrator threatened to discipline him if he missed a meal break and submitted a time adjustment form. ECF No. 101-3 ¶ 11. Bailey adds that she was ignored when she asked her supervisor for help completing a time adjustment form. ECF No. 101-4 ¶ 11. Smith alleges that, based on specific conversations with her supervisors, "the general sentiment" amongst patient care workers was that "if you did not get a break, there was nothing you could do to fix it." ECF No. 101-5 ¶ 10. And Johnson claims that she was never told that there was a mechanism to correct an erroneous deduction.[5] ECF No. 101-6 ¶ 10.

---

[5] Defendants argued at the hearing that Johnson's allegation undermines conditional certification, but the Court disagrees. Not telling an employee that there is a way to correct an erroneous deduction is just another way of "discouraging" employees from correcting erroneous deductions.

Notably, given the lenient burden at step one, the submission of consistent employee declarations has long been treated as sufficient to justify conditional certification. Hargrove v. Ryla Teleservices, Inc., No. 2:11cv344, 2012 WL 489216, at *8 (E.D. Va. Jan. 3, 2012), report and recommendation adopted, No. 2:11cv344, 2012 WL 463442 (E.D. Va. Feb. 13, 2012). As illustrated above, the declarations before the Court are consistent with respect to Defendants' purported meal break practices; thus, Plaintiff has presented sufficient evidence to warrant conditional certification. However, as discussed below, Plaintiff's evidence is too limited to support as broad a collective as he seeks.

First, Plaintiff's evidence is simply insufficient to justify conditional certification of a nationwide collective. When declarations come exclusively from a small, geographically homogenous group of declarants, conditional certification of a nationwide collective is inappropriate if the declarants lack personal knowledge about the policies or practices at other offices. McNeil I, 2016 WL 11673836, at *3; see also Smith v. Smithfield Foods, Inc., No. 2:21cv194, 2021 WL 6881062, at *10 (E.D. Va. Dec. 21, 2021) ("Certification of a nationwide class also generally requires personal knowledge that the policies extend to other facilities."), report and recommendation adopted, No. 2:21cv194, 2022 WL 407378 (E.D. Va. Feb. 9, 2022). For example, in Bernard v. Household International, Inc., 231 F. Supp.

17

2d 433, 435-36 (E.D. Va. Nov. 21, 2002), the Court certified a collective of employees at two of the defendant's Virginia offices because the declarations in support of the plaintiff's motion were exclusively written by employees at those offices. The Court did not extend conditional certification to defendant's offices in fourteen other states, however, because the declarants' bases of knowledge regarding practices at other offices were vague and their allegations were speculative.  See id. (finding statements like "From my experience . . . working closely with [putative collective members] throughout the country and through socializing with them," "It is my understanding," and "I believe that" insufficient to support a nationwide collective).  In this case, all four declarants' experiences were limited to a small number of facilities in the Hampton Roads region of Virginia, and none of the declarations levy specific allegations regarding unlawful practices at other facilities. See ECF Nos. 101-3, 101-4, 101-5, 101-6.   Without more specific information, the Court cannot conclude, even at step one, that patient care workers at the facilities identified in the declarations are similarly situated to patient care workers at any other facility owned by Autumn or affiliated with Saber.  Put another way, Plaintiff's sample is far too small and homogenous for the Court to conclude that it is representative of all facilities, and the record is devoid of evidence demonstrating that Saber directed the unlawful meal break

practices.[6]   Conditional certification is thus appropriate only with respect to the facilities identified in the four declarations: Autumn's Portsmouth, Suffolk, and Chesapeake facilities, and the Saber-affiliated Portside and Waterside facilities.[7]   See Bernard, 231 F. Supp. 2d at 435-36.

Second, Plaintiff's evidence is insufficient to expand the collective beyond CNAs.   Though "plaintiffs need only show that their positions are similar, not identical, to the positions held by putative class members," Grayson v. K Mart Corp., 79 F.3d 1086, 1096 (11th Cir. 1996) (alteration and internal quotation marks omitted), Plaintiff has not provided the Court with sufficient evidence to conclude that other positions are similar to CNAs in the relevant sense.   Plaintiff's claim relies fundamentally on the fact that putative collective members were regularly unable to

---

[6] Plaintiff claimed at the hearing that because Saber gives policy recommendations to facilities, and because there were unlawful meal break practices at five facilities in Virginia, the practices came from Saber. But this is merely an attempt by Plaintiff to repackage his "bottom up" evidence as "top down" evidence.   Plaintiff has provided no evidence that Saber ordered, or even suggested, that facility administrators should implement the alleged unlawful meal break practices.   As the Court indicated at the hearing, Plaintiff's assertion is not evidence; it is an inference grounded largely in speculation.

[7] Though there is record evidence showing that Plaintiff was employed by a third-party contracting service who handled his payroll when he worked for Portside and Waterside, see ECF No. 101-30, at 75-77, Plaintiff alleges in his affidavit that he was employed by Defendants at the Portside and Waterside facilities, ECF No. 101-3 ¶ 2, and the Court is not permitted to resolve factual disputes or weigh credibility at the conditional certification stage, see Stacy v. Jennmar Corp. of Va., Inc., No. 1:21cv15, 2022 WL 1442247, at *7 n.3 (W.D. Va. May 6, 2022).     Moreover, Johnson, one of the opt-in plaintiffs, was actually employed by Portside.   ECF No. 101-6 ¶ 2.   For these reasons, the Court includes both Portside and Waterside in the conditionally certified collective.

take meal breaks because of chronic understaffing and the inability to leave patients without coverage. Viewed that way, the collective must be composed of only those positions that face such challenges. Here, all four of Plaintiff's declarations come from CNAs, and they provide little to no information about the experiences of any individuals in other positions. See ECF Nos. 101-3, 101-4, 101-5, 101-6. To get around this, Plaintiff has submitted job descriptions of positions he would like to include in the collective, but the descriptions likewise provide little information about the actual experiences of individuals in those positions. See ECF No. 101-26. This is particularly problematic because some positions—such as nurse supervisor, RN supervisor, and charge nurse—appear primarily supervisory in nature, and other positions—such as MDS nurse and infection control nurse—appear focused on policymaking. While direct patient care work may perhaps be involved in performing some of those jobs, the job descriptions do not indicate how much time is spent actually doing it, or whether such responsibilities carry over into break periods; the Court can only speculate. Further, uncontradicted evidence in the record shows that the job descriptions are suggestions from Saber, and that specific facilities can—and do—amend them to meet specific facility needs. See ECF No. 101-29, at 26, 38-39.

In sum, while Plaintiff has presented sufficient evidence for conditional certification on the meal break policy, there is a

disconnect between the evidence Plaintiff presents and the broad scope of the collective he requests.  The consistent employee declarations supporting Plaintiff's motion sufficiently demonstrate that the CNAs at the Portsmouth, Suffolk, Chesapeake, Portside, and Waterside facilities are similarly situated, but Plaintiff's evidence does not support conditional certification of a collective any broader than that.

### C. Defendants' Additional Objections

In opposition to Plaintiff's motion, Defendants raise several additional arguments against conditional certification.  For the reasons outlined below, the Court rejects Defendant's arguments.

### 1. "Happy Camper" Declarations

Defendants point to the eight declarations in support of their opposition brief to argue that Plaintiff and the opt-ins were not victims of a common policy or plan to violate the FLSA.  ECF No. 102, at 17; ECF Nos. 102-4 to 102-11.  But these declarations—known as "happy camper" declarations—"are generally entitled to little or no weight at this stage, given the risk that the employer secured such declarations through explicit or implicit coercion." Spencer v. Macado's Inc., No. 6:18cv5, 2019 WL 4739691, at *4 (W.D. Va. Sept. 27, 2019); accord Thomas v. Maximus, Inc., No. 3:21cv498, 2022 WL 1482010, at *6 (E.D. Va. May 10, 2022); Crosby v. Stage Stores, Inc., 348 F. Supp. 3d 742, 749 (M.D. Tenn. 2018) (collecting cases).  Accordingly, the existence of these

declarations does not undermine the Court's conditional certification decision.

## 2. Arbitration Agreements

Defendants next allege that "all but one of Plaintiff's opt-ins thus far have executed arbitration agreements," and thus conditional certification is inappropriate because "[t]he existence of arbitration agreements is another factor that will require individualized assessment among the putative members of the collective." ECF No. 102, at 24-25.  Plaintiff counters that the enforceability of arbitration agreements is a merits issue that is properly considered at the decertification stage, not the conditional certification stage.  ECF No. 103, at 18.

The Fourth Circuit has yet to address whether the existence of arbitration agreements impacts the conditional certification analysis.  Lancaster v. FQSR, No. 8:19cv2632, 2020 WL 5500227, at *6 (D. Md. Sept. 11, 2020).  But the majority of district courts that have addressed this issue have concluded that evaluating the enforceability of an arbitration agreement is premature at the conditional certification stage, at least when the named plaintiff has not signed an arbitration agreement.  Camara v. Mastro's Rests. LLC, 340 F. Supp. 3d 46, 59 (D.D.C. 2018) (collecting cases). There are three reasons for this.  First, it is more efficient to resolve arbitration issues in one fell swoop at the decertification stage, rather than at both the conditional certification stage and

the decertification stage. See Lancaster, 2020 WL 5500227, at *7.
Second, the resolution of arbitration issues is more accurate after
notice is disseminated, as the "scope and substance of those issues
become clearer" once the size and composition of the collective is
established. See Gordon v. TBC Retail Grp., Inc., 134 F. Supp. 3d
1027, 1039 n.9 (D.S.C. 2015). Finally, whether putative collective
members are subject to arbitration agreements has no bearing on
whether they were victims of a common policy or plan that violated
the FLSA, as both things can be true at the same time. See Romero
v. La Revise Assocs., LLC, 968 F. Supp. 2d 639, 646-47 (S.D.N.Y.
2013).

Because there is no indication that Plaintiff signed an
arbitration agreement, and because Defendants have not presented
any persuasive reasons justifying a departure from the majority
view among district courts on this issue, the existence of
arbitration agreements does not alter the Court's conditional
certification decision.

### 3. Statute of Limitations

Defendants argue next that the FLSA's statute of limitations
imposes an "additional layer of independent inquiry" that
"counsels against collective action." ECF No. 102, at 25. For
FLSA claims, the statute of limitations is two years, but it
extends to three years when the cause of action arises out of a
willful FLSA violation. See 29 U.S.C. § 255(a). In support of

23

their position, Defendants contend that one of the opt-in plaintiff's claims is time barred because she was last employed at Defendants' facilities in 2018.  ECF No. 102, at 25.  However, Defendants' argument fails for two reasons.  First, Plaintiff's collective definition has a built-in a three-year limitations period to comport with the FLSA's statute of limitations, so any individual with a time-barred claim is categorically excluded from the collective.  See ECF No. 100, at 1.  Second, though the Court will likely have to address whether the two-year or three-year statute of limitations applies (Plaintiff alleges that Defendants' violations were willful), the question of whether the violations of the FLSA were willful is a merits determination that courts do not ordinarily address at the conditional certification stage. See Lee v. Metrocare Servs., 980 F. Supp. 2d 754, 768-69 (N.D. Tex. 2013) (collecting cases); see also Curtis, 2013 WL 1874848, at *3 (noting that the presence of individual defenses is considered at the decertification stage).  For these reasons, the Court rejects Defendants' argument that the statute of limitations precludes conditional certification.

## 4. Joint Employer

Finally, Defendants suggest in their opposition brief that conditional certification is inappropriate because Saber did not employ any of the putative collective members.  See ECF No. 102, at 27-28.  At the hearing, however, Defendants conceded that the

24

"joint employer" question is a merits issue properly addressed at the decertification stage.  Given the law in this circuit, and in others, Defendants were correct to make that concession.  See Mendoza v. Baird Drywall & Acoustic, Inc., No. 7:19cv882, 2021 WL 2435873, at *4 (W.D. Va. June 15, 2021) (explaining that courts have reserved the joint employer issue for the decertification stage); Rivera v. Power Design, Inc., 172 F. Supp. 3d 321, 327 (D.D.C. 2016) (same and citing cases); Presson v. Recovery Connections Cmty., No. 5:18cv466, 2019 WL 3047114, at *3 (E.D.N.C. July 11, 2019) (holding that the court need not "resolve at [step one] whether the responding defendants were, in fact, joint employers under the FLSA"); Choimbol, 475 F. Supp. 2d at 563 (finding that resolution of the "joint employer" question "is not essential to the 'stage one' analysis for conditional certification"). Accordingly, the Court will not address the joint employer question at this stage.

## IV. NOTICE

As discussed previously, once a collective action is conditionally certified, a court can facilitate the opt-in process by authorizing a plaintiff to disseminate notice of the suit to potential plaintiffs.  Houston, 591 F. Supp. 2d at 831–32. District courts have broad discretion over the dissemination of notice.  Byard v. Verizon W. Va., Inc., 287 F.R.D. 365, 372 (N.D. W. Va. 2012).  In this case, Plaintiff has submitted a proposed

notice and opt-in consent form, as well as proposed scripts, and he makes several requests to facilitate the opt-in process. Defendants, in response, have several objections.

### A. Length of the Opt-In Period

Plaintiff requests a 90-day opt-in period. ECF No. 100, at 2. Defendants, on the other hand, request a 45-day opt-in period. ECF No. 102, at 29. "District courts in the Fourth Circuit generally authorize opt-in periods between thirty and ninety days." Privette v. Waste Pro of N.C., Inc., No. 2:19cv3221, 2020 WL 1892167, at *7 (D.S.C. Apr. 16, 2020); see also Butler v. DirectSAT USA, LLC, 876 F. Supp. 2d 560, 575 (D. Md. 2012) (authorizing a 90-day opt-in period because "numerous courts around the country have authorized 90-day opt-in periods for collective actions"). Defendants present no sound reason to deny Plaintiff's request for a 90-day opt-in period. See ECF No. 102, at 29. The Court therefore **GRANTS** Plaintiff's request for a 90-day opt-in period.

### B. Contact Information and Method of Notice

In order to disseminate notice, Plaintiff asks the Court to order Defendants to provide counsel with putative collective members' names, current or last known physical addresses, email addresses (both personal and work), phone numbers (home, mobile, and alternative numbers), dates of employment, and locations worked within 10 days of conditional certification of the

26

collective.   ECF No. 101, at 23.   Plaintiff requests this
information because he would like to disseminate notice via mail,
email, and text message.   See id. at 2.   Citing privacy concerns,
Defendants object to the production of email addresses and phone
numbers.   ECF No. 102, at 28.

Mail sent via the United States Postal Service is the default
mechanism for disseminating notice, but courts routinely require
the disclosure of email addresses because email has become a more
reliable and ubiquitous method of communication than paper
mailing.   See O'Quinn v. TransCanada USA Servs., Inc., 469 F. Supp.
3d 591, 610 (S.D. W. Va. 2020).   With respect to phone numbers,
however, courts in this circuit are split.   Some judges—expressing
privacy concerns—have required plaintiffs to demonstrate a
"special need" to obtain putative collective members' phone
numbers.   See id.; Pecora v. Big M Casino, Inc., No. 4:18cv1422,
2019 WL 302592, at *5 (D.S.C. Jan. 23, 2019); see also Houston,
591 F. Supp. 2d at 836 n.9 (permitting disclosure of phone numbers
only if mail is returned undeliverable).   Other judges, however,
have declined to impose such a requirement.   See Thomas, 2022 WL
1482010, at *7.

In this Court's view, the added reliability of text messaging
does not outweigh its invasiveness, particularly when email notice
is available.   Sending text messages will subject potential opt in
plaintiffs "to the annoyance of unsolicited messages that Congress

passed the Telephone Consumer Protection Act, in part, to address." Miller v. JAH, LLC, No. 5:16cv1543, 2018 WL 305819, at *3 (N.D. Ala. Jan. 5, 2018). Moreover, individuals with limited phone plans may have to incur an unwanted fee to receive text message notice. Hollis v. R & R Rests., Inc., No. 3:21cv965, 2022 WL 1303263, at *5 (D. Or. May 2, 2022). For these reasons, the Court agrees with the district court rulings that have required a showing of special need in order to obtain phone numbers. Applied here, Plaintiff has not demonstrated a special need for putative collective members cell phone numbers—such as a unique aspect of putative collective members' jobs that makes email much less reliable, see, e.g., O'Quinn, 469 F. Supp. 3d at 610. The Court therefore **DENIES** Plaintiff's request for phone numbers, and consequently, **DENIES** Plaintiff's request for notice via text message. The Court does, however, **GRANT** Plaintiff's request for putative collective members' names, current or last known physical addresses, dates of employment, locations worked, and email addresses. The Court also **GRANTS** Plaintiff's request to disseminate notice via mail and email.

### C. Reminder Notice

Plaintiff seeks permission to send a reminder notice to putative collective members halfway through the opt-in period. ECF No. 101, at 26. Defendants object to this request, arguing

that reminder notices create the appearance of undue Court involvement in the solicitation of claims.   ECF No. 102, at 29.

Courts in this circuit are split on whether a reminder notice midway through the opt-in period is appropriate.   Some judges, questioning the necessity of a reminder notice and expressing concern over harassment, have prohibited sending any reminder notices.  See, e.g., Stacy, 2021 WL 4787278, at *5; Mebane v. GKN Driveline N. Am., Inc., 337 F.R.D. 479, 487 (M.D.N.C. 2020); O'Quinn, 469 F. Supp. 3d at 610.  Other judges, expressing concerns about privacy, have permitted reminder notices via mail and email, but not text message.   See, e.g., Brown v. Energy Servs. Grp. Int'l, Inc., No. 3:21cv611, 2021 WL 5889707, at *4 (E.D. Va. Dec. 13, 2021).  And still other judges, focusing on the fact that a reminder notice ensures that putative collective members are informed of the collective action, have permitted plaintiffs to send a reminder notice via mail, email, and text message.   See, e.g., Thomas, 2022 WL 1482010, at *8; Lupardus v. Elk Energy Servs., LLC, No. 2:19cv529, 2020 WL 4342221, at *9-10 (S.D. W. Va. July 28, 2020); Privette, 2020 WL 1892167, at *7.

Given the Court's decision not to permit text message notice in this case, the Court has less concern than it otherwise would about the threat of undue influence if a reminder notice is sent to putative collective members.   The Court is also persuaded by the suggestions made by counsel at the hearing to include a

disclaimer at the top of the notice clearly indicating that the Court does not encourage or discourage participation in the suit. Accordingly, the Court **GRANTS** Plaintiff's request to disseminate reminder notices halfway through the opt-in period.

## D. Execution of Notice

Plaintiff asks that the Court permit putative collective members to execute their consent forms electronically through a website hosted by a third party. ECF No. 101, at 27. District courts regularly permit electronic signatures of consent forms, as technological advances have made electronic signatures trustworthy and reliable.    See, e.g., Thomas, 2022 WL 1482010, at *8; Gagliastre v. Capt. George's Seafood Rest., LP, No. 2:17cv379, 2018 WL 9848232, at *5 (E.D. Va. Mar. 13, 2018); Graham v. Hall's S. Kitchens, LLC, 331 F.R.D. 619, 622 (D.S.C. 2018).    The Court therefore **GRANTS** Plaintiff's request to let opt-in plaintiffs electronically sign their consent forms.

## E. Meet and Confer

Defendants contend that, if conditional certification is granted, the Court "should direct the parties to confer over the appropriate scope, content, and method of notice." ECF No. 102, at 28.    Plaintiff argues that requiring the parties to meet and confer will delay the dissemination of notice to potential

30

plaintiffs, whose claims may extinguish due to the FLSA's statute of limitations. ECF No. 103, at 19.

With respect to the scope and contents of the notice, courts generally refrain from modifying a plaintiff's proposed notice unless it is necessary. Brown, 2021 WL 5889707, at *3. Here, alterations are necessary given the parties' agreement at the hearing to include a disclaimer explicitly stating that the Court does not encourage or discourage participation in the suit. The parties are therefore **ORDERED** to confer over the scope and contents of the notice and scripts to ensure that they conform with this Opinion and Order.

As to the method of notice, the only issue the parties need to discuss is the use of a third party to administer notice. Courts in this circuit regularly require the use of a third-party administrator to protect the privacy of potential opt-in plaintiffs. See, e.g., Privette, 2020 WL 1892167, at *8; Lynch v. Dining Concepts Grp., LLC, No. 2:15cv580, 2015 WL 5916212, at *7 (D.S.C. Oct. 8, 2015); Robinson v. Empire Equity Grp., Inc., No. 1:09cv1603, 2009 WL 4018560, at *5 (D. Md. Nov. 18, 2009). Defendants have requested a third-party administrator, ECF No. 102, at 29, and Plaintiff is not opposed as long as the parties are able to come to a cost-sharing agreement, ECF No. 103, at 19 n.7. The Court therefore **ORDERS** the parties to confer on a third-party administrator and discuss the issue of payment.

To ensure that discussions of these issues are not prolonged, the Court **ORDERS** the parties to submit a proposed notice, proposed scripts, and a plan for a third-party administrator within 10 days of the entry of this Opinion and Order.

## V. CONCLUSION

For the reasons stated above, Plaintiff's motion is **GRANTED in part and DENIED in part**. The Court conditionally certifies the following collective:

> All current and former hourly, non-exempt certified nursing assistants employed by Saber Healthcare Group, LLC ("Saber") and/or Autumn Corp. ("Autumn") who worked at Autumn's Portsmouth, Suffolk, or Chesapeake facilities, or the Saber-affiliated Portside or Waterside facilities, at any time in the last three years until resolution of this suit.

Defendants are **ORDERED** to provide, within **ten (10) days** of this Opinion and Order, putative collective members' names, current or last known physical addresses, email addresses (both personal and work), dates of employment, and locations worked.

The parties are **ORDERED** to meet and confer about a third-party administrator and discuss the scope and contents of the notice and scripts to ensure that they conform with the Court's conditional certification decision. The notice forms shall include a disclaimer explicitly stating that the Court does not encourage or discourage participation in this suit. The parties are further **ORDERED** to file, within **ten (10) days** of this Opinion

and Order, a proposed notice, proposed scripts, and a plan for a third-party administrator.

The Clerk is **REQUESTED** to forward a copy of this Opinion and Order to counsel of record.

**IT IS SO ORDERED.**

/s/ _____

Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
August 25 , 2022

33